UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CRUNCHYROLL, INC., et al.,

      Plaintiffs,

      v.

ARIA ADMIRAL, et al.,

      Defendants.

Case No.  11-cv-02334-JCS

**REPORT AND RECOMMENDATION RE MOTION FOR DEFAULT JUDGMENT**

**Dkt. No. 79**

## I.    INTRODUCTION

This is a copyright infringement action.  Plaintiffs Crunchyroll, Inc. ("Crunchyroll") and TV TOKYO, Inc. ("TV Tokyo") allege that Defendants Daniel Pledge, Aria Admiral, Moe Ahmad and William Barrera have unlawfully copied and uploaded anime videos onto YouTube, LLC ("YouTube") in violation of Plaintiffs' exclusive distribution rights and copyright.  None of the Defendants have filed an answer or otherwise responded to this action.  The Clerk has entered default as to each Defendant.

Plaintiffs filed a Motion for Default Judgment ("Motion").  A hearing was held, at which the undersigned identified a number of issues for Plaintiffs to address through supplemental briefing and evidence, including the lack of evidence supporting Plaintiffs' request for damages.[1]

---

[1] The complaint in this case was initially filed on May 5, 2011.  Several issues have delayed the ultimate issuance of this Report and Recommendation.  Because several named defendants provided false identifying information in their counter-notifications to YouTube, Plaintiffs encountered difficulty identifying and serving each of the original thirteen defendants. By September 2011, only three defendants had been served, one of which had been served by alternative means with the permission of the court.  Dkt. Nos. 14, 19-20.  Nine of the defendants were eventually dismissed for lack of service.  Dkt. No. 42.  The undersigned also granted Plaintiffs' motion for additional time to serve "Basil Hawkins," as well as Plaintiffs' subsequent motion to substitute the party name "Daniel Pledge" for "Basil Hawkins."  Dkt. Nos. 49, 59. Default was entered against Daniel Pledge on May 22, 2013.  Dkt. No. 70.  After Plaintiffs filed

United States District Court
Northern District of California

The supplemental materials submitted by Plaintiffs address most of the issues identified at the hearing, but Plaintiffs still fail to support their request for damages with evidence.  Accordingly, it is recommended that the Motion for Default Judgment be GRANTED in part and DENIED in part.

## II.  BACKGROUND

### A.  Factual Allegations

#### 1.  Plaintiffs' Creation and Distribution of Anime

Plaintiffs in this action are Crunchyroll and TV Tokyo.  TV Tokyo is a Japanese company and is the world's leading broadcaster and distributor of anime video.  Second Amended Complaint ("SAC") ¶ 9; Affidavit of James Lin ("Lin Decl.") ¶ 3.  Anime refers to animated movies or television programs originating in Japan.  Second Amended Complaint ("SAC") ¶ 16.  "Anime" is an abbreviated pronunciation in Japanese of "animation."  *Id.*

The subject matter of this action is Anime products that are created in Japan in the form of television serials, and distributed by TV Tokyo under the following series titles: Naruto, Naruto Shippuden and Bleach (collectively, the "Anime Serials").  *Id.* ¶ 17; Lin Decl. ¶ 4.  TV Tokyo owns the copyright for each of these Anime Serials.  Second Affidavit of James Lin ("Supp. Lin Decl.") ¶ 4.  Each of these Anime Serials consists of numerous television shows (each an "Anime Episode").  *Id.*  Each Anime Episode is first broadcast and publically displayed in Japan by TV Tokyo.  SAC ¶ 25.

Crunchyroll, a California corporation with headquarters in San Francisco, is the operator of Crunchyroll.com, which distributes, via internet streaming, Anime television programs worldwide outside of Japan.  SAC ¶ 9; Lin Decl. ¶ 2.  Crunchyroll provides a streaming video service that allows viewing of Anime Serials to subscribers, and after a period of time, to non-subscribers through ad-supported streaming.  SAC ¶ 18; Supp. Lin Decl. ¶ 7.  Under licensing agreements with TV Tokyo, Crunchyroll makes the Anime Episodes available for video streaming within

their amended motion for default judgment, the undersigned held a hearing on September 6, 2013 and requested supplemental evidence and briefing.  Plaintiffs submitted their supplemental materials on December 13, 2013.

United States District Court
Northern District of California

1    hours of the time that they are first broadcast in Japan.  *Id*.  When TV Tokyo broadcasts the Anime

2    Serials in Japan, the voiceovers are in Japanese.  *Id*. ¶ 5.  Crunchyroll translates the voiceovers

3    into English.  *Id*. ¶ 8.

4         After the first television broadcast screening of each new Anime Episode in Japan,

5    Crunchyroll has a seven day exclusive right to stream the Anime Episodes in certain parts of the

6    world, including the United States.  SAC ¶ 19; Lin Decl. ¶ 6.  The exclusive seven-day period is

7    known as the "On Demand Window."  SAC ¶ 21; Lin Decl. ¶ 6.  No other company has the right

8    to stream Anime Episodes during this seven-day period.  Supp. Lin Decl. ¶ 9.  During the On

9    Demand Window, Crunchyroll offers the new Anime Episode to subscribers who pay a

10   subscription fee to Crunchyroll for Anime content in the amount of $6.95 per month, or for all

11   content in the amount of $11.95 per month.  Lin Decl. ¶ 6.

12        After the On Demand Window, Anime Episodes are available online from Crunchyroll,

13   either in a subscription format or in the form of ad-supported streaming which is free to the

14   consumer.  SAC ¶ 21; Lin Decl. ¶ 7.  After the On Demand Window, a second United States

15   company, Hulu, has a licensing agreement with Viz Anime (a licensee of TV Tokyo) to stream

16   Anime Episodes.  Supp. Lin Decl. ¶ 12.  Plaintiffs state that once Hulu is allowed to stream Anime

17   Episodes, Hulu captures approximately 39% of the market share, and Crunchyroll keeps 61% of

18   the market share.  *Id*. ¶ 13.

19                    2.    Defendants' Alleged Infringement

20        Plaintiffs allege that each Defendant, using a self-selected "user name," has without the

21   permission or consent of Plaintiffs, published and/or distributed Anime Episodes for which

22   Plaintiffs had exclusive rights by posting the downloaded content on the online media distribution

23   system provided through YouTube.[2]  SAC ¶¶ 23-24; Supp. Lin. Decl. ¶ 9.  As a result, Defendants

24   have made it possible for other persons to obtain and view the public performance of the listed

25   Anime Episodes without reviewing them on the Crunchyroll website by subscription or within

26   Crunchyroll's ad-supported environment.  Lin Decl. ¶ 8.

27   _____

28         [2] YouTube is a video sharing service with its principal place of business in San Bruno,
     California.  SAC ¶ 22.

United States District Court
Northern District of California

Plaintiffs state that the Anime Episodes were all uploaded to YouTube during Crunchyroll's seven-day exclusivity period and posted on YouTube in English.  Supp. Lin Decl. ¶¶ 17-18.  Plaintiffs state that Defendants either downloaded the Anime Episodes from Crunchyroll's website, or from Japanese TV broadcast and used English subtitles originating from Crunchyroll's website.  *Id*. ¶ 20.  Crunchyroll is the only official source for English language Anime Episodes during the time the first videos appeared on YouTube.  *Id*. ¶ 19.

### 3.   YouTube's Take-Down Notices & Counter-Notifications

Plaintiffs provided YouTube with a notice to take down each Anime Episode from YouTube's website.  SAC ¶ 32; Lin Decl. ¶ 10.  YouTube removed the various Anime Episodes, and then notified the persons who uploaded the Anime Episodes of their statutory right under 17 U.S.C. § 512 to provide a "counter-notification" if the removal was due to a mistake or misidentification of the material.  *Id*. ¶ 33; Lin Decl. ¶ 10.  Each of the four Defendants in this action provided a counter-notification, which required Plaintiffs to file this lawsuit in order to keep the infringing content from being reposted to YouTube.  Lin Decl. ¶ 11.

In the counter-notifications, each Defendant stated in writing: "I swear, under the penalty of perjury, that I have a good faith belief the material was removed due to a mistake or misidentification of the material to be removed or disabled."  SAC ¶ 35.  Plaintiffs alleged that the counter-notifications were false and fraudulent and that each of the Defendants understood that he or she had no ownership of and no permission to use any of the Anime Episodes.  *Id*. ¶ 36. Plaintiffs allege that the counter-notifications constitute an admission that the Defendants were engaged in copyright infringement.  *Id*. ¶ 37.

YouTube's take-down notices and Defendants counter-notifications were sent and received by email.  *Id*. ¶ 34.  Plaintiffs allege that the Defendants' response to YouTube's emails verified that the email addresses provided by the Defendants to YouTube actually belong to Defendants. *Id*.  In the counter-notification, Defendants were required, under 17 U.S.C. § 512(g)(3)(D), to provide his or her actual name, address and phone number.  SAC ¶ 35.  Defendants provided fictitious contact information.  Lin Decl. ¶ 12.

//

United States District Court
Northern District of California

4

**B.      Identifying the Defendants, Service & Entry of Default**

Plaintiffs initially filed this action on March 11, 2011 against several individual defendants.  *See* Dkt. No. 1.  Plaintiffs discovered information regarding Defendants' identities through service of subpoenas on Google, which owns YouTube.  In the subpoena, Plaintiffs sought the identity of Defendants through the Internet Service Provider ("ISP") Defendants used in connection with their YouTube accounts.  *Id.*

Google's disclosures identified the email addresses, names and addresses for three of the four Defendants in this lawsuit: Aria Admiral, William Barrera, and Moe Ahmad.  Lin Dec. ¶ 13-15 and Ex. A.  The address of Defendant Ahmad is 1818 South George Mason Drive, Arlington, Virginia.  Lin Decl. Ex. A.  The address of Defendant Admiral is 825 Locust Avenue, Apartment 103, Long Beach, California.  *Id.*  The address of Defendant Barrera is 926 Locust Avenue, Apartment 209, Long Beach, California.  *Id.*

These three Defendants were served with the First Amended Complaint.[3]  Dkt. Nos. 19-21 (Proof of Service).  Defendant Barrera was served by personal service at his address.  Dkt. No. 20.  Defendant Admiral was served via email in compliance with this Court's order dated August 16, 2011.  Dkt. Nos. 14, 21.  Plaintiffs state that Defendant Ahmad was served by substituted service—the service processer served the summons and other relevant documents on Kelly Anna Maria Magan, a resident of 7003 Larrlyn Dr., Springfield, VA 22151.  The Clerk entered default as to Defendant Ahmad and Defendant Barrera on September 26, 2011, and as to Defendant Admiral on November 14, 2011.  Dkt. Nos. 23, 29 (Entries of Default).

The fourth Defendant in this action is Daniel Pledge.  Defendant Pledge used the pseudonym "Basil Hawkins" in connection with acts alleged in the Second Amended Complaint.  *See* Lin Decl. ¶ 14.  At the outset of this litigation, "Basil Hawkins" was uploading videos to YouTube through his various YouTube accounts titled BleachEpisodesSubbed, NarutoDubEpisodes, ShippudenDubEpisodes, and EdenOfTh3East.  *Id.* ¶ 15.  Because of multiple

---

[3] The First Amended Complaint, with the exception of additional allegations asserted against Defendant Daniel Pledge, is identical to the Second Amended Complaint.  *See* Dkt. Nos. 9, 62.

1    complaints regarding illegal uploading, those accounts were terminated by YouTube (the

2    "Terminated Accounts"). *Id.* ¶ 16. Plaintiffs state that due to Pledge's use of the pseudonym

3    "Hawkins" and the termination of the Hawkins YouTube accounts, they were unable to discover

4    Pledge's identity through the subpoenas initially served on Google.

5         After the Hawkins YouTube accounts were terminated, Plaintiffs assert that "Hawkins"

6    resumed uploading Crunchyroll material through another YouTube account titled

7    EdenOfTh3East2. Lin Decl. ¶ 17. "Hawkins" also maintained at least two other active accounts

8    on YouTube: PwNaGeDaN and EdenOfTheEastYT (collectively, the "New Accounts"). *Id.*

9         Plaintiffs assert that through subpoenas to Google, Crunchyroll was able to determine that

10   the user of the Terminated Accounts and the New Accounts is the same. Lin Decl. ¶ 18. Plaintiffs

11   assert that each account: (1) was created from a IP address in the United Kingdom; (2) was created

12   with a fee anonymous Hotmail.co.uk account that was often related to the YouTube user account

13   (e.g., NarutoDubEpisodes was created with NarutoDubEpisodes@hotmail.co.uk); and (3) the

14   postal code provided was WN88NS or WN88NF (a postal code near Skelmersdale, Lancashire,

15   UK). *Id.*

16        The New Accounts were also linked to some of the Terminated Accounts. Lin Decl. ¶ 19.

17   The account holder used YouTube's "featured channels" feature to link each of his accounts when

18   they were all active. *Id.* Now only the active accounts remain linked through the "featured

19   channels" feature. *Id.*

20        Moreover, the comments by users, as well as "Hawkins," reference the EdenOfTh3East2

21   account as a "backup account" for the EdenOfTh3East account. Lin Decl. ¶ 20. Plaintiffs assert

22   that this evidence establishes that "Hawkins" operated these additional lines. *Id.*

23        Following the more recent uploaded content to YouTube, Crunchyroll was able to obtain

24   more recent ISP addresses for "Hawkins." Lin Decl. ¶ 21. Through this discovery, Crunchyroll

25   found that "Hawkins" was using Microsoft Hotmail accounts. *Id.* Plaintiffs subpoenaed

26   Microsoft and obtained the name and address of Daniel Pledge, who opened the "Basil Hawkins"

27   accounts. *Id.* The address provided by Microsoft was 63 Tanfields, Skelmesdale, Lancashire,

28   U.K. WN8 8NS. *See* SAC ¶ 11; Dkt. No. 66 (Proof of Service). After Defendant Pledge failed to

United States District Court
Northern District of California

1   file an answer or responsive motion, the Clerk entered default against Pledge on May 22, 2013.

2   Dkt. No. 70.

3        While Defendant Pledge did not appear in this action, he did contact Plaintiff's counsel by

4   email on May 21, 2013.  Affidavit of Maureen Mulligan in Support of Motion for Entry of Default

5   Judgment and Assessment of Damages ("Mulligan Decl.") ¶ 2 and Ex. A.  In this email,

6   Defendant Pledge writes that he received service and admits that his address is 63 Tanfields,

7   Lancashire, Skelmersdale WN8 8NS.  *See id*.  Defendant Pledge writes that he responded to the

8   summons by sending an email on May 10, 2013 to mail@smab.co.uk.  *Id*.  Pledge admits that he

9   "used the term Basil Hawkins on YouTube, which is what [his] friends know [him] by."  *Id*.

10  Pledge also admits that he uploaded Anime Episodes on YouTube.  *See id.*

11       **C.       Plaintiffs' Motion for Default Judgment**

12       In the Motion for Default Judgment, Plaintiffs request that four Defendants in this action

13  be permanently enjoined from uploading infringing Anime Episodes onto YouTube.  Plaintiffs

14  also seek to recover their actual damages caused by Defendant Pledge.  When Plaintiffs first filed

15  their Motion for Default Judgment, they sought actual damages in the amount $24,795,373.88,

16  plus costs and interest.  Plaintiffs submitted supplemental briefing and evidence after the hearing,

17  and now seek $16,302,699.79 in damages, or, in the alternative, $4,087,950.65, which Plaintiffs

18  state is based on a more "conservative" estimation of actual damages.  Supp. Lin Decl. ¶¶ 45-46

19  and Exs. E-F.

20       At the hearing, the undersigned expressed doubt that Plaintiffs' method of calculating

21  "actual damages" under 17 U.S.C. § 504(b) was appropriate.  Plaintiffs sought to recover their

22  own lost profits, and calculated "actual damages" by assuming that "but for" Defendant Pledge's

23  infringement, all of the Anime Episodes watched on YouTube and uploaded by Defendant Pledge

24  would have been watched on Crunchyroll's website.  Plaintiffs were asked to submit legal

25  authority supporting an award of their own lost profits, as well as evidence that shows Defendant

26  Pledge caused Plaintiffs' lost profits.

27       In their supplemental materials, Plaintiffs adhere to their original method of calculating

28  damages, and provide more detailed and accurate calculations explaining that method.

*United States District Court*
*Northern District of California*

7

1    Nevertheless, as discussed below, Plaintiffs still fail to submit authority showing that an award of

2    lost profits is appropriate, or evidence showing that Defendant Pledge caused their lost profits.

3    **III.    DISCUSSION**

4        **A.    Personal Jurisdiction**

5          When entry of judgment is sought against a party who has failed to plead or otherwise

6    defend, a district court has the affirmative duty to look into its jurisdiction over the subject matter

7    and the parties.  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  Plaintiffs initially argued that all

8    four Defendants are subject to personal jurisdiction because they consented to jurisdiction in this

9    district by submitting their counter-notifications to YouTube.  At the hearing, Plaintiffs were

10   asked to revisit this issue.

11         Plaintiffs allege that when Defendants submitted their counter-notifications to YouTube,

12   they agreed to the following in writing: "I consent to the jurisdiction of the Federal District Court

13   for the district in which my address is located, *or if my address is outside of the United States*, the

14   judicial district in which YouTube is located, and will accept service of process from the

15   claimant[.]"  SAC ¶ 35 (emphasis added).  Under the plain language of the consent provision, only

16   Defendant Pledge consented to jurisdiction by submitting a counter-notification because he has an

17   address outside of the United States, and therefore, consented to "the judicial district in which

18   YouTube is located" under the terms of the consent provision alleged in the Second Amended

19   Complaint.

20         In *S.E.C. v. Ross*, the Ninth Circuit wrote that "[i]n general, … a party has consented to

21   personal jurisdiction when the party took some kind of affirmative act—accepting a forum

22   selection clause, submitting a claim, filing an action—that fairly invited the court to resolve the

23   dispute between the parties." 504 F.3d 1130, 1149 (9th Cir. 2007) (citations omitted).  The court

24   recognized that "parties may consent to jurisdiction through a forum selection clause in a contract,

25   … [or] by filing a proof of claim in a bankruptcy proceeding[.]"  *Ross*, 504 F.3d at 1149 (citing

26   *Nat'l Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16 (1964); *Dow Chem. Co. v. Calderon,*

27   422 F.3d 827, 831 (9th Cir. 2005); *Tucker Plastics, Inc. v. Pay'N Pak Stores, Inc.,* 99 F.3d 910,

28   911(9th Cir.1996) (per curiam)).

United States District Court
Northern District of California

1     While Defendant Pledge's submission of a counter-notification to YouTube is not a

2  contract, it is an assertion of his rights, which is the type of "affirmative act" contemplated in

3  *Ross*.  This affirmative act required Plaintiffs to file this lawsuit in order to keep the infringing

4  content from being reposted to YouTube.  Lin Decl. ¶ 11.  Defendant Pledge, when submitting his

5  counter-notification, expressly consented to jurisdiction in the district in which YouTube is

6  located.  Therefore, there is personal jurisdiction over Defendant Pledge.

7     The next question is whether the court has jurisdiction over the Defendants who have *not*

8  consented to the jurisdiction of this court under the terms of the consent provision above because

9  they do not live outside of the United States or in this district.  Defendants Barrera and Admiral

10  are residents of Long Beach, California, and thus are subject to jurisdiction in California.  Venue

11  is also proper because Crunchyroll is located in San Francisco and suffered the alleged injuries in

12  San Francisco.  Thus, the Northern District of California is "a judicial district in which a

13  substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. §

14  1391(b)(2).  Accordingly, jurisdiction and venue are proper with respect to Defendants Barrera

15  and Admiral.

16     Defendant Ahmad, on the other hand, is a resident of Georgia, not California.  At the

17  hearing, Plaintiffs were asked to address whether there is personal jurisdiction over Defendant

18  Ahmad.  Plaintiffs argue that Defendant Ahmad has established "minimum contacts" with

19  California such that "the exercise of jurisdiction 'does not offend traditional notions of fair play

20  and substantial justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir.

21  2004) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)).  Specifically,

22  Plaintiffs contend that there is specific jurisdiction over Defendant Ahmad because "[i]n

23  downloading material from the Crunchyroll website and uploading it to YouTube," Defendant

24  Ahmad has purposefully availed himself of the privileges of conducting activities in California by

25  some affirmative act.  Supp. Br. at 5.

26     The undersigned disagrees.  The exercise of specific jurisdiction over a nonresident

27  defendant requires the satisfaction of the three following factors:

28

United States District Court
Northern District of California

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). "The first prong of the specific jurisdiction test refers to both purposeful direction and purposeful availment." *Marviz Photo*, 647 F.3d at 1228. In cases involving tortious conduct, such as the "tort-like cause of action" of copyright infringement, "purposeful direction is the proper analytical framework." *Id*. (internal quotation omitted).

To determine whether a defendant "purposefully directs his activities at a forum state," courts apply the "effects" test from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). This test "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1206 (9th Cir.2006) (*en banc*) (quoting *Schwarzenegger*, 374 F.3d at 803). The "effects" test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quotations omitted).

In this case, Defendant Ahmad meets the first prong of the "effects" test because he unquestionably committed an intentional act by uploading copyrighted material on YouTube. *Marviz Photo*, 647 F.3d at 1229 (finding "no question" that defendant "acted intentionally [by] reposting the allegedly infringing photos"). Nevertheless, there is an insufficient basis to find that the third prong of the "effects" test is satisfied−that Defendant Ahmad knew the harm was likely to be suffered in California. Plaintiffs do not even allege that Defendant Ahmad knew Crunchyroll operated its business in California. Accordingly, there is no basis to find that Defendant Ahmad purposefully directed his conduct at California.

United States District Court
Northern District of California

1    Having failed to establish that Defendant Ahmad purposefully directed his conduct at

2    California, Plaintiffs have not established that the court may exercise specific personal jurisdiction

3    over Defendant Ahmad.  Consideration of the second and third elements of the specific

4    jurisdiction analysis is unnecessary.   Defendant Ahmad should be dismissed from this lawsuit.

5    **B.      Service of Process**

6        While the undersigned finds that service as to the three of the four Defendants was proper,

7    there is an additional problem with Defendant Ahmad—there is insufficient evidence that

8    Defendant Ahmad was ever served before the Clerk entered default.  The First and Second

9    Amended Complaints state that Defendant Ahmad's address is 1818 S. George Mason Drive,

10   Arlington, Virginia ("the Arlington address").  SAC ¶ 14; First Amended Complaint ¶ 16.  This

11   was the address provided by Google for Ahmad when responding to Plaintiffs' subpoena.  *See* Lin

12   Decl. Ex. A.  Nonetheless, the proof of service states that Defendant Ahmad was served by

13   substituted service when the service processer gave the relevant documents to "Kelly Anna

14   Magan, Resident at the address of: 7003 Larrlyn Dr., Springfield, VA 22151, who resides therein

15   and informed said person of the contents therein, in compliance with state statutes."  Dkt. No. 19.

16       At the hearing, the Court asked Plaintiffs to explain why the address where Moe Ahmad

17   was served does not match Moe Ahmad's address provided by Google.  Plaintiff submitted the

18   Affidavit of Laura Creekmore, who is the office manager for American Legal Investigations and

19   Support Services ("ALIASS") at the time it received the Summons and Complaint to be served on

20   Moe Ahmad.  Affidavit of Laura Creekmore ("Creekmore Decl.") ¶ 3.  Creekmore explains that

21   according to ALIASS records, the process server initially attempted service at the Arlington

22   address on July 6, 2011, but was told by the owner of the home at the Arlington address that Moe

23   Ahmad no longer lived there.  The owner was unable to provide a forwarding address.  *Id.* ¶ 7a.

24       The next day, ALIASS performed an electronic search in attempt to identify a new address

25   for Moe Ahmad.  *Id.* ¶ 7b.  When the name Moe Ahmad was searched, one hit came up and

26   identified a person named Moe Ahmad as a female.  The search also provided a birth date and a

27   partial social security number for this female Moe Ahmad.  *Id.*  Over two years later, on December

28   6, 2013, ALIASS inquired with the homeowner of the Arlington address, who said that Moe

11

1   Ahmad was a man.  *Id.* ¶¶ 8-9.

2        It is unclear whether Plaintiffs were aware of this gender discrepancy in 2011.  After

3   finding the social security number and birthdate associated with the female Moe Ahmad, Plaintiffs

4   then found that the name Moe Ahmad was also associated with the name "Adeela Ahmad," who

5   had an address at 7003 Larrlyn Drive, Springfield VA 22151 ("the Springfield address").  *Id.* ¶ 7c.

6   The service processer then went to the Springfield address and spoke with a woman named Kelley

7   Anna Maria Magan, who explained that she worked full time for "Adeela M. Ahmad" who lived at

8   the Springfield address, and also confirmed that Adeela M. Ahmad "may possibly be an alias" for

9   Moe Ahmad.  *Id.* ¶ 7e.

10        With this information, the service processer left the Summons, Complaint and other

11   relevant documents with Ms. Magan in an effort to serve Defendant Ahmad by substituted service.

12   *Id.*  Defendant Ahmad failed to respond, and default was entered.

13        The undersigned is doubtful that Defendant Ahmad was ever served.  The link between

14   Defendant Ahmad and the Springfield address is tenuous at best.  First, when ALIASS realized

15   that Defendant Ahmad was no longer at the Arlington address, ALIASS merely did an "electronic

16   search" for a new address.  Thus, unlike Defendant Barrerra, who was served at the address which

17   corresponded to Google's IPS records, the address where ALIASS served Moe Ahmad was found

18   through a mere "electronic search" with a name.  Second, the "Moe Ahmad" found in this search

19   was a female.  The owner of the Arlington address told the process server that Moe Ahmad was a

20   male.  The process server never indicated whether he asked Ms. Magan if Moe Ahmad was male

21   or female.  Third, Ms. Magan only confirmed, at most, that "Adeela M. Ahmad *may possibly be* an

22   alias for Moe Ahmad."  *Id.* ¶ 7e (emphasis added).  The uncertainty of Ms. Magan's statement

23   only enhances the Court's doubt that Defendant Ahmad lives at the Springfield address.

24        Because there is reason to doubt that Defendant Ahmad was served, and because the Court

25   does not have personal jurisdiction over Defendant Ahmad, he should be dismissed from this

26   lawsuit.  For the remaining analysis, the undersigned refers to "Defendants" to include only

27   Defendants Admiral, Barrera and Pledge.

28   //

United States District Court
Northern District of California

12

1

**C.     Legal Standard − Motion for Default Judgment**

2      After default has been entered against a party, a court may grant default judgment in its

3  discretion.  If the court is satisfied that jurisdiction is proper and that service of process upon the

4  defendant was adequate, courts are instructed to consider several facts in determining whether to

5  grant default judgment:

6          (1) the possibility of prejudice to the plaintiff, (2) the merits of
           plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)
7          the sum of money at stake in the action, (5) the possibility of a
           dispute concerning material facts, (6) whether the default was due to
8          excusable neglect, and (7) the strong policy underlying the Federal
           Rules of Civil Procedure favoring decisions on the merits.
9

10  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  In making its decision, the court takes

11  all factual allegations in the complaint, except those relating to damages, as true.  *TeleVideo*

12  *Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) (citing *Geddes v. United Fin.*

13  *Grp.*, 559 F.2d 557, 560 (9th Cir. 1977)).  The scope of relief "must not differ in kind from, or

14  exceed in amount, what is demanded in the pleadings."  Fed.R.Civ.P. 54(c).

15      **D.     *Eitel* Analysis**

16      Consideration of all the *Eitel* factors weighs in favor of entering default judgment.

17  Because Defendants have failed to file an answer or otherwise respond to this action, Plaintiffs

18  will be prejudiced if default is not granted, as they will be left without a remedy.  As discussed

19  below, the undersigned recommends only issuing an injunction and not granting an award of any

20  monetary damage, thus no money is at stake.  There is also no indication that there would be a

21  material dispute in this action, or that default was entered due to excusable neglect.  Service as to

22  Defendants Barrerra, Admiral and Pledge was proper.  Defendant Pledge sent an email to

23  Plaintiffs' counsel, in which he believed he filed a responsive pleading by sending an email to

24  mail@smab.co.uk.  Mulligan Decl. Ex. A.  Nevertheless, Defendant Pledge had been informed

25  through the papers served on him how to file a responsive pleading.  Accordingly, any neglect on

26  part of Defendant Pledge was not excusable.

27      The merits of Plaintiffs' claim and the sufficiency of the Second Amended Complaint also

28  weigh in favor of granting default judgment.  Prior to reaching this conclusion, however, the

United States District Court
Northern District of California

1   undersigned considered three important issues.  The first is whether both Crunchyroll and TV

2   Tokyo have standing to bring the copyright infringement action.  The second is whether Plaintiffs

3   may assert a claim for copyright infringement based on the infringed Anime Serials, which are not

4   registered copyrights in the United States.  The third issue is whether United States' copyright

5   laws apply to the conduct of Defendant Pledge, who resides in the United Kingdom and not in the

6   United States.

7                              **1.     *Plaintiffs have Standing***

8         TV Tokyo is the owner of the copyrights for the Anime Serials.  Supp. Lin Decl. ¶ 4.

9   Crunchyroll is a licensee of TV Tokyo.  *Id.* ¶ 7.  Plaintiffs assert two reasons why they believe

10  Crunchyroll has standing in this case.  First, Plaintiffs note that TV Tokyo executed a Power of

11  Attorney authorizing Crunchyroll to bring legal action against the infringers.  Second, Plaintiffs

12  state that Crunchyroll was given a seven-day exclusive license to display the Anime Videos during

13  the On Demand Window.  The undersigned finds that Crunchyroll only has standing by virtue of

14  its seven-day exclusive license, and not through the Power of Attorney.

15                              **i.   Power of Attorney**

16        The Power of Attorney does not confer standing on Crunchyroll.  To have standing to

17  assert a claim for copyright infringement, the plaintiff must be the "legal or beneficial owner of an

18  exclusive right under a copyright."  17 U.S.C. § 501(b); *Silvers v. Sony Pictures Entm't, Inc.*, 402

19  F.3d 881, 884 (9th Cir. 2005) (*en banc*) (holding that, under § 501, only a party with an exclusive

20  right in a copyright has standing to sue).  Section 106 of the 1976 Copyright Act provides a list of

21  such exclusive rights:

22        (1) to reproduce the copyrighted work in copies or phonorecords;
          (2) to prepare derivative works based upon the copyrighted work;
23        (3) to distribute copies or phonorecords of the copyrighted work to
          the public by sale or other transfer of ownership, or by rental, lease,
24        or lending;
          (4) in the case of literary, musical, dramatic, and choreographic
25        works, pantomimes, and motion pictures and other audiovisual
          works, to perform the copyrighted work publicly;
26        (5) in the case of literary, musical, dramatic, and choreographic
          works, pantomimes, and pictorial, graphic, or sculptural works,
27        including the individual images of a motion picture or other
          audiovisual work, to display the copyrighted work publicly; and
28

United States District Court
Northern District of California

14

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

*17 U.S.C. § 106.*  "[T]he list of exclusive rights found in § 106 is exhaustive.... If a right is not 'specified,' then it is not one of the exclusive rights granted by Congress." *Silvers*, 402 F.3d at 886–87.

"The right to sue for an accrued claim for infringement is not an exclusive right under § 106." *Silvers*, 402 F.3d at 884.  Therefore, in *Silvers*, the Ninth Circuit held that "the bare assignment of an accrued cause of action is impermissible under 17 U.S.C. § 501(b)." *Id*. at 890. Rather, to have standing to bring a copyright infringement claim, "the plaintiff must have a legal or beneficial interest in at least one of the exclusive rights described in § 106," and "the infringement must be 'committed *while* he or she is the owner of' the particular exclusive right allegedly infringed.'" *Id*. at 885 (quoting 17 U.S.C. § 501(b) (emphasis added)); *see also Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013); *Minden Pictures, Inc. v. John Wiley & Sons, Inc*., No. 12-4601 EMC, 2014 WL 295854, at *5-10 (N.D. Cal. Jan. 27, 2014); *Contra Piracy v. Does 1-2919*, No. 13-1133 EDL, 2013 WL 3828771, at *3 (N.D. Cal. July 23, 2013); *cf. Nat'l Photo Grp., LLC v. Allvoices, Inc*., No. 13-03627 JSC, 2014 WL 280391, at *2-4 (N.D. Cal. Jan. 24, 2014).

The Power of Attorney does not grant Crunchyroll any exclusive right in the copyrights for the Anime Serials.  By signing the Power of Attorney, TV Tokyo merely "agree[d] that [Crunchyroll] may take legal actions on [TV Tokyo's] behalf in federal and/or state court under [the] exclusive distribution rights and rights under copyright …." Supp. Lin Decl. Ex. B (Power of Attorney).   The Power of Attorney is, therefore, a "bare assignment" of a cause of action, and is insufficient to confer standing on Crunchyroll to bring a copyright infringement claim. *Silvers*, 402 F.3d at 890.

### ii.   Seven-Day Exclusive License

The next question is whether Crunchyroll has standing by virtue of its seven-day exclusive license to stream the Anime Episodes during the On Demand Window.  Section 201(d) of the Copyright Act, entitled "Transfer of Ownership," authorizes the transfer of an exclusive right in a

United States District Court
Northern District of California

1   copyright as follows:

2         (1) The ownership of a copyright may be transferred in whole o*r in*
3         *part* by any means of conveyance or by operation of law, and may
        be bequeathed by will or pass as personal property by the applicable
4         laws of intestate succession.

5         (2) Any of the exclusive rights comprised in a copyright, *including*
        *any subdivision of any of the rights specified by section 106*, may be
6         transferred as provided by clause (1) and owned separately.  The
        owner of any particular exclusive right is entitled, to the extent of
7         that right, to all of the protection and remedies accorded to the
        copyright owner by this title.

8   17 U.S.C. § 201(d) (emphasis added).  Unlike the 1909 Copyright Act, the 1976 Copyright Act

9   authorizes the division and transfer of less than the entire copyright.  *Silvers*, 886 F.3d at 886-87.

10  The statute expressly permits the transfer one of just one of the specified exclusive rights in

11  section 106, or some portion of that exclusive right.  17 U.S.C. § 201(d).  "In other words,

12  exclusive rights may be chopped up an owned separately, and each separate owner of a subdivided

13  exclusive right may sue to enforce that owned portion of an exclusive right, no matter how small."

14  *Silvers*, 886 F.3d at 887.

15        Section 101 of the Copyright Act defines "transfer of ownership" as "an assignment,

16  mortgage, *exclusive license … of any of the exclusive rights comprised in a copyright, whether or*

17  not it is limited in time or place of effect, *but not including a nonexclusive license.*"  *Id*. § 101

18  (emphasis added).  Pursuant to the licensing agreement, Crunchyroll is granted an exclusive

19  license to stream the new Anime Episodes for the first seven days after they are broadcast, and a

20  nonexclusive license thereafter.  Supp. Lin Decl. ¶¶ 9-12.  Plaintiffs allege that all of the Anime

21  Episodes were uploaded to YouTube during Crunchyroll's seven-day exclusivity period.  *Id*. ¶ 18.

22  Thus, all of the alleged infringement occurred "while" Crunchyroll was the owner of the exclusive

23  right to stream the Anime Episodes.  *Silvers*, 402 F.3d at 885 (quoting 17 U.S.C. § 501(b)).

24        Nevertheless, to determine whether Crunchyroll has standing, the undersigned must

25  consider whether TV Tokyo in fact transferred an exclusive right to Crunchyroll.  Section 204 of

26  the Copyright Act states that "[a] transfer of copyright ownership … is *not valid* unless an

27  instrument of conveyance, or a note or memorandum of the transfer, is *in writing and signed by*

28  *the owner of the rights conveyed* or such owner's duly authorized agent."  17 U.S.C. § 204(a)

United States District Court
Northern District of California

1   (emphasis added).  While there is no requirement for any "magic words," writing is required to

2   evidence a transfer.  *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927

3   (9th Cir. 1999).  Plaintiffs have not submitted any writing signed by TV Tokyo which evidences

4   the transfer of any exclusive right to Crunchyroll.

5   　　　Despite the lack of any writing signed by TV Tokyo, section 204(a) should not preclude

6   Crunchyroll from establishing standing in this case.  There is no dispute between the transferor

7   (TV Tokyo) and the transferee (Crunchyroll) regarding the validity of this transfer.  Rather, TV

8   Tokyo is a named Plaintiff in this action, and, together with Crunchyroll, has represented that it

9   granted Crunchyroll an exclusive seven-day license to stream the Anime Episodes after they are

10  first broadcast.  At least four circuit courts, including the Ninth Circuit, have noted that "in

11  situations 'in which the copyright holder appears to have no dispute with its licensee on [the issue

12  of transfer], it would be anomalous to permit a third party infringer to invoke this provision

13  against the licensee.'"  *Radio Television Espanola S.A.*, 183 F.3d at 929 (quoting *Eden Toys, Inc.*

14  *v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir.1982)); *see also Metro. Reg'l Info.*

15  *Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600-01 (4th Cir. 2013) (adopting the

16  rule of *Eden Toys*); *Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.,* 70 F.3d 96, 99

17  (11th Cir.1995) (same).  Thus, the lack of writing should not preclude Crunchyroll from asserting

18  a copyright infringement claim.

19  　　　In addition to section 204(a)'s writing requirement, section 205 states that "[a]ny transfer

20  of copyright or other document pertaining to a copyright *may be* recorded in the Copyright

21  Office.…"  17 U.S.C. § 205(a) (emphasis added).  Even though the express language of section

22  205 does not require parties to record a transfer prior to bringing an infringement suit, the Ninth

23  Circuit looked at legislative history from 1976 regarding section 205, and wrote in dicta that

24  "when a copyright interest is transferred[,] *it must be recorded* to protect the copyright holder's

25  right to bring an infringement suit."  *Silvers*, 402 F.3d at 885 (emphasis added) (citing 17 U.S.C. §

26  205(d); H.R. Rep. No. 94-1476, at 129 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5744 ("The

27  provisions of subsection (d)[] requir[e] recordation of transfers as a prerequisite to the institution

28  of an infringement suit."))  By looking at a House Report from 1976, the Ninth Circuit researched

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    legislative history that corresponded with section 205 in its original form in the 1976 Copyright

2    Act.  Section 205(d) formerly provided that "[n]o person claiming by virtue of a transfer to be the

3    owner of copyright or of any exclusive right under a copyright is entitled to institute an action

4    under this title *until the instrument of transfer under which such person claims has been recorded*

5    *in the Copyright Office*, but suit may be instituted after such recordation on a cause of action."  17

6    U.S.C. § 205(d) (1988) (emphasis added).

7         Nevertheless, the former subdivision (d) was repealed effective March 1, 1989 through the

8    Berne Implementation Act of 1988, and subdivisions (e) and (f) were re-codified as subdivisions

9    (d) and (e).  *See* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 5, 102

10   Stat. 2853, 2857.  "Accordingly, there is no longer a requirement that the transfer be recorded in

11   order for the transferee to commence an action." *AMC Film Holdings LLC v. Rosenberg*, No. 03-

12   3835, 2005 WL 2105792, at *3 (E.D.N.Y. Aug. 31, 2005) (citing *Lida, Inc. v. Texollini, Inc.*, 768

13   F. Supp. 439, 443 n. 4 (S.D.N.Y. 1991) ("Recordation of transfer is not at issue because the recent

14   amendments to the copyright law have eliminated 17 U.S.C. § 205(d), the requirement for

15   recordation of transfers."); *Kenbrooke Fabrics, Inc. v. Soho Fashions, Inc.*, No. 87-5775, 1989

16   WL 117704, at *1 n. 1 (S.D.N.Y. Oct. 2, 1989) ("This requirement of recordation as a prerequisite

17   to an infringement suit was repealed as to claims that accrued after the Berne Convention on

18   copyright, 17 U.S.C. § 205(d) (Supp.1989), entered into force as to the United States, which

19   occurred on March 1, 1989.")).  Indeed, the Ninth Circuit has twice recognized that "this section

20   was repealed effective March 1, 1989, to conform to the Berne Convention."  *Lloyd v. Schlag*, 884

21   F.2d 409, 411 n. 1 (9th Cir. 1989); *see also In re World Auxiliary Power Co.*, 303 F.3d 1120,

22   1125-26 (9th Cir. 2002) (quoting 17 U.S.C. § 205(a)) ("the Copyright Act's provision for

23   recording 'transfers of copyright ownership' … is permissive, not mandatory: 'Any transfer of

24   copyright ownership or other document pertaining to copyright *may* be recorded in the Copyright

25   Office…..'") (emphasis added in *In re World Auxiliary Power*).  Therefore, there is no

26   requirement that Crunchyroll record a transfer prior to filing a claim for infringement.

27        Accordingly, the undersigned finds that transfer to Crunchyroll of an exclusive right in the

28   copyright occurred for the On Demand Window for each Anime Episode, and therefore,

1   Crunchyroll has standing to assert a claim for infringement which occurred during the On Demand

2   Window.  *Silvers*, 402 F.3d at 885; 17 U.S.C. §§ 201(d); 501(b).

3                                   **iii.   TV Tokyo**

4           Having found that Crunchyroll has standing to bring a claim for infringement that occurred

5   during the On Demand Window, the next question is whether TV Tokyo also has standing to

6   assert an infringement claim with respect to the same infringing conduct.  As noted above, section

7   501(b) provides that "[t]he legal *or beneficial owner* of an exclusive right under a copyright is

8   entitled … to institute an action for any infringement of that particular right committed while he or

9   she is the owner of it."  17 U.S.C. § 501(b) (emphasis added).

10          The Copyright Act does not define what makes an individual a "beneficial owner" of a

11  copyright or of an exclusive right in a copyright.  *See* 17 U.S.C. § 101 (definitions).  The

12  legislative history of the Act, however, provides one example—"a 'beneficial owner' … would

13  include, for example, an author who had parted with legal title to the copyright in exchange for

14  percentage royalties based on sales or license fees."  H.R.Rep. No. 94-1476, 94th Cong., 2d Sess.

15  159, *reprinted in* 1976 U.S. Code & Cong. & Ad. News 5569, 5575.  "District courts in the Ninth

16  Circuit have narrowly defined 'beneficial owner' as being only an individual who had legal title

17  and parted with it in exchange for royalties."  *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,

18  No. 12-4601 EMC, 2014 WL 295854, at *10 (N.D. Cal. Jan. 27, 2014) (citations omitted).

19          TV Tokyo is the textbook example of a beneficial owner of the exclusive right which was

20  transferred to Crunchyroll.  TV Tokyo was the original holder of legal title, but transferred an

21  exclusive right in the copyright to Crunchyroll in exchange for a share of Crunchyroll's profits.

22  *See* Supp. Lin Decl. ¶ 43.  Accordingly, TV Tokyo also has standing to bring the copyright

23  infringement claim against Defendants for infringement which occurred during the On Demand

24  Window.

25                  **2.      *Registration of the Copyright is Not a Prerequisite to the Copyright***
                             ***Infringement Action***
26

27          Section 411(a) of the Copyright Act provides that "no civil action for infringement of the

28  copyright in any United States work shall be instituted until preregistration or registration of the

United States District Court
Northern District of California

1    copyright claim has been made[.]" 17 U.S.C. § 411(a).  Under section 411, all "United States

2    work" must have a registered copyright prior to time in which a copyright infringement claim is

3    brought.  *Id*.  Moreover, section 501(b) expressly conditions a plaintiff's standing on compliance

4    with section 411.  *Id*. § 501(b).  Plaintiffs contend that the Anime Serials are not "United States

5    work," and therefore, it was not necessary to register a copyright prior to asserting a claim for

6    copyright infringement.

7         In 1989, the United States agreed to the Berne Convention, an international copyright

8    treaty that, among other things, prohibits signatories from imposing copyright formalities as a

9    condition to the protection of works of nationals of other member countries.  *Kernal Records Oy v.*

10   *Mosley*, 794 F. Supp. 2d 1355, 1359 (S.D. Fla. 2011) (citing Christopher Sprigman,

11   *Reform(aliz)ing Copyright,* 57 Stan. L.Rev. 485, 488 (2004)).  "To meet obligations necessary to

12   adhere to the Convention, the United States eliminated many of the formalities for foreign works,

13   including the registration requirement of § 411(a)."  *Id*.; *see also* Berne Convention

14   Implementation Act of 1988, Pub.L. No. 100–568, 102 Stat. 2853 (1988).

15        Section 101 of the Copyright Act defines "United States work," and provides that

16   published work is only a "United States work" if the work is first published:

17             (A) in the United States;
18             (B) simultaneously in the United States and another treaty party or
                 parties, whose law grants a term of copyright protection that is the
                 same as or longer than the term provided in the United States;
19             (C) simultaneously in the United States and a foreign nation that is
20             not a treaty party; or
               (D) in a foreign nation that is not a treaty party, and all of the
21             authors of the work are nationals, domiciliaries, or habitual residents
               of, or in the case of an audiovisual work legal entities with
22             headquarters in, the United States.

23   17 U.S.C. § 101.

24        Plaintiffs allege that "[e]ach Anime Episode is first broadcast and publicly displayed in

25   Japan by TV Tokyo."  SAC ¶ 25.  Thus, Plaintiffs have sufficiently alleged that the Anime

26   Episodes are not first published "in the United States" or "simultaneously in the United States and

27   another treaty party…."  *Id*. § 101(A)-(B).  Moreover, Japan is party to the Berne Convention, thus

28   subsections (C) and (D)—which apply to the publishing of material in countries which are *not*

20

1    party to the Berne Convention—do not apply.  Accordingly, Plaintiffs have sufficiently alleged

2    that the Anime Serials are not "United States work" as contemplated by section 411(a), and

3    therefore, are excused from section 411(a)'s requirement that a copyright be registered prior to

4    filing an infringement claim.

5                  **3.**       ***United States Copyright Laws Apply to the Conduct of Defendant Pledge***

6            Defendant Pledge resides in the United Kingdom and not in the United States.  Defendant

7    Pledge allegedly copied and uploaded the Anime Episodes in the United Kingdom, which were

8    uploaded on YouTube's California-based servers, and were then made available for viewing

9    around the world, including in the United States.

10           While it is clear "that the United States copyright laws do not reach acts of infringement

11   that take place entirely abroad," *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d

12   1088, 1098 (9th Cir. 1994), the more complicated question is whether the infringing conduct must

13   occur entirely within the United States.  *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1145 (N.D.

14   Cal. 2011) (Koh, J.) ("courts are split on whether the infringing act must occur wholly within the

15   United States or if the infringing act only must not occur wholly outside of the United States.").

16   For instance, in *Allarcom Pay Television Ltd. v. General Instrument Corp.*, the Ninth Circuit

17   stated that "one alleged infringement must be completed entirely within the United States."  69

18   F.3d 381, 387 (9th Cir. 1995) (holding that the Copyright Act did not apply to authorizing

19   infringing transmissions that occurred in Canada or broadcasting infringing material from the

20   United States into Canada because the infringing acts were not complete until the signal was

21   received in Canada).

22           In *Shropshire*, Judge Koh held that a plaintiff stated a claim for copyright infringement

23   against a defendant who made a video in Canada that infringed the plaintiff's copyright, and then

24   uploaded that video in Canada to YouTube's California servers.  *Shropshire*, 809 F.Supp.2d at

25   1145.  Judge Koh held that the defendant's act of infringement constituted "an act of infringement

26   that is not 'wholly extraterritorial' to the United States," and distinguished the Ninth Circuit's

27   decision in *Allarcom*.  Judge Koh wrote that "[t]hose cases holding that the Copyright Act requires

28   at least one infringing act to occur entirely within the United States dealt with situations in which

United States District Court
Northern District of California

1    the infringing transmission was authorized or sent from within the U.S. but received and accessed

2    abroad." *Shropshire*, 809 F.Supp.2d at 1145.  Judge Koh recognized that the circumstances in

3    *Shropshire*—which are nearly identical to the circumstances here—reflected "the opposite

4    scenario," where the alleged infringement began abroad but culminated here in the United States.

5    *Id*.  Judge Koh held that the plaintiff stated a claim for copyright infringement where the

6    defendant's "direct action led to the creation of a copy of the [infringing] video on YouTube's

7    servers in California, and to the subsequent viewing of the video by potentially thousands in the

8    United States."  *Id*. at 1146.

9           The undersigned is persuaded by Judge Koh's reasoning, and finds that United States

10   copyright laws apply to the conduct of Defendant Pledge.  Here, Defendant Pledge copied and

11   uploaded over 3,000 Anime Episodes, presumably while he was in the United Kingdom.  Those

12   videos have been transmitted, through YouTube's California Services, to potentially thousands of

13   viewers in the United States.  Thus, the infringing conduct was not "wholly extraterritorial" to the

14   United States.

15                                    *       *       *

16          Accordingly, consideration of all the *Eitel* factors, including the merits of Plaintiffs' claim

17   and sufficiency of the complaint, weighs in favor of granting default judgment.

18          **E.      Requested Relief**

19                  **1.      *Permanent Injunction against Defendants Barrera, Admiral and Pledge***

20          United States' copyright laws vest courts with the power to grant injunctive relief.  17

21   U.S.C. § 502.  For violations of 17 U.S.C. § 501, "any court having jurisdiction of a civil action

22   under this title may ... grant temporary and final injunctions on such terms as it may deem

23   reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).

24          Plaintiffs request that the following permanent injunction be issued against all Defendants:

25                  Defendants are permanently enjoined from Directly or indirectly
                    infringing Plaintiffs' rights in the Anime Serials or any anime
26                  product, whether now in existence or hereafter created, that is
                    owned, exclusively distributed, or otherwise controlled by the
27                  Plaintiffs, including without limitation by using the Internet or
                    any website or service to reproduce, copy, distribute, download,
28

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

upload, or make available for distribution, sale, display, or
viewing any of the Plaintiffs' anime products, and to destroy all
copies thereof that Defendants have obtained in violation of
Plaintiffs' copyrights.

Dkt. No. 76-3 (Proposed Order).

The scope of the requested injunction is reasonable and necessary to prevent further
infringement of Plaintiffs' copyrights.  Accordingly, Plaintiffs' request for an injunction against
Defendants Barrera, Admiral and Pledge should be granted.

### 2.   *Damages against Defendant Pledge*

As noted above, Plaintiffs were informed at the hearing that their request for over $24
million in damages to be assessed against Defendant Pledge was unsupported by evidence and
legal authority.  The supplemental evidence submitted by Plaintiffs does not address the concerns
raised at the hearing.  Accordingly, the undersigned recommends that no award of damages be
granted.

Section 504(b) of the Copyright Act provides that a "copyright owner is entitled to recover
the *actual damages* suffered by him or her as a result of the infringement, and any *profits of the
infringer* that are attributable to the infringement and are not taken into account in compute
damages."  17 U.S.C. § 504(b) (emphasis added).  "These remedies are two sides of the damages
coin—the copyright holder's losses and the infringer's gains."  *Polar Bear Prods., Inc. v. Timex
Corp.*, 384 F.3d 700, 708 (9th Cir. 2004).  Plaintiffs do not allege that Defendant Pledge profited
through his infringement, and do not seek "any profits of the infringer …"  17 U.S.C. § 504(b).
Rather, Plaintiffs only request "actual damages" in the form of their *own* lost profits.

Section 504(b) "does not elaborate on how the [actual] damages are to be calculated."
*Jarvis v. K2 Inc.*, 486 F.3d 526, 533-34 (9th Cir. 2007).  Nevertheless, the Ninth Circuit has held
that " '[a]ctual damages' are usually determined by the loss in the fair market value of the
copyright, measured by the profits lost due to the infringement or by the value of the use of the
copyrighted work to the infringer.' "  *Polar Bear Prods.*, 385 F.3d at 708 (quoting *McRoberts
Software, Inc. v. Media 100, Inc.*, 329 F.3d 557 (7th Cir. 2003)).  The "test of market value" is
"what a willing buyer would have been reasonable required to pay to a willing seller for plaintiffs'

23

1    work." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985)

2    (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174

3    (9th Cir. 1977)).

4            Despite being granting a second chance to prove their entitlement to damages, Plaintiffs

5    have not attempted to prove a hypothetical licensing fee (i.e. a reasonable royalty rate) that

6    Defendant Pledge would have paid Plaintiffs assuming all parties had been willing.  Rather,

7    Plaintiffs seek to recover the profits they would have earned from subscription and ad-based

8    revenue had Defendant Pledge not illegally uploaded the Anime Episodes on YouTube.

9            In the supplemental briefing and evidence, Plaintiffs request $16,302,699.79 in damages,

10   which represents Plaintiffs' total lost profits if we consider both lost ad revenue and lost

11   subscription revenue.  Supp. Lin Decl. ¶ 46, Ex. F.  Plaintiffs state that Crunchyroll generates

12   more revenue from subscription revenue than ad revenue, and state that 34% of the Anime

13   Episodes watched on Crunchyroll's website are watched by paying subscribers.  Lin Decl. ¶ 32;

14   Supp. Lin Decl. ¶¶ 46, 97.  In the alternative, Plaintiffs request $4,087,950.65 in damages, which

15   Plaintiffs state is based on a more "conservative" estimate because it assumes that all of the Anime

16   Episodes uploaded by Defendant Pledge on YouTube would have been watched in Crunchyroll's

17   ad-supported environment.  Supp. Lin Decl. ¶ 45, Ex. F.[4]

18           There is insufficient evidence to support an award of either amount of damages.  In a

19   copyright infringement action, a plaintiff is only entitled to an award of actual damages which are

20   "a result of the infringement."  17 U.S.C. § 504(b).  Therefore, "a plaintiff in a § 504(b) action

21   must establish [a] causal connection" between the infringement and actual damages.  *Polar Bear*

22   *Prods.*, 384 F.3d at 708.  In *DSPT International, Inc. v. Nahum*, the Ninth Circuit upheld an award

23   _____

24           [4] As explained in detail in the Second Affidavit of James Lin, Plaintiffs take several factors
     into account when calculating their estimated losses, including: (1) that after the On Demand
25   Window, Crunchyroll only has 61% of the market (¶53); (2) that TV Tokyo still receives revenue
     for the other 39% share of the market (*id.*); (3) that Crunchyroll and TV Tokyo share costs (¶¶ 64-
26   68); and (4) that TV Tokyo shares costs with its other licensees at a different rate (¶ 69).  Plaintiffs
     also calculated damages separately for "take down" and "purged" videos because Plaintiffs have
27   an actual view count for take down videos, and estimated the number of purged videos.  *Id.* ¶¶ 49-
     52, 74-76.  The undersigned recognizes that Plaintiffs provided detailed and accurate calculations
28   in the Second Affidavit of James Lin, which was lacking in Lin's initial affidavit.  Nevertheless,
     the method of calculating damages still suffers from the same fatal flaws.

1    of a plaintiff's lost profits under 15 U.S.C. § 1117, which authorizes an award of "any damages"

2    when there is a violation of a trademark.  624 F.3d 1213, 1224 (9th Cir. 2010).  The Court wrote:

3          *Proof of a decline in sales* combined with evidence tending to
           discount the importance of other market factors, such as the
4          evidence of positive business conditions and the success of similar
           businesses not subject to the defendant's tortious conduct, can be
5          sufficient to establish a causal connection between the plaintiff's
           decline in sales and the misconduct of the defendant.
6

7    *Id.* (emphasis added) (quoting Restatement (Third) of Unfair Competition § 36 cmt. h (1995)).

8          As explained to Plaintiffs at the hearing, their method of calculating damages rests on the

9    factual predicate that all of the Anime Episodes that were uploaded by Pledge and watched on

10   YouTube would have been watched on Crunchyroll's website had the Anime Episodes not been

11   available on YouTube.  In other words, Plaintiffs assume that Defendant Pledge *caused* Plaintiffs'

12   lost profits, but provide no evidence in support of this assumption.  There is no evidence, for

13   instance, that the amount of Anime Episodes watched on Crunchyroll.com declined during the

14   time of Pledge's infringement.  *Cf. Nahum*, 624 F.3d at 1224 (holding that "[p]roof of a decline in

15   sales" combined with other evidence "can be sufficient to establish a causal connection….").

16         There is also no evidence that the Anime Episodes watched on YouTube would have been

17   watched on Crunchyroll's website.  YouTube.com and Crunchyroll.com are different websites

18   which attract a different client base.  Many of the YouTube viewers may have only watched the

19   Anime Episodes because they were free, because they were on YouTube, or because they could

20   watch them for free during the first week on YouTube without commercials.  *See* Supp. Lin Decl.

21   ¶ 18.  Even Plaintiffs admit that "[t]he benefit that viewers receive from watching an internet

22   stream of an Anime Episode on YouTube is that it is free and the free view does not contain any

23   advertising banners or advertising interruption."  Supp. Lin Decl. ¶ 24.  One can only speculate

24   that YouTube viewers would have watched videos on Crunchyroll's website─and that is exactly

25   the point.  *Frank Music Corp.*, 772 F.2d at 513 ("In a copyright action, a trial court is entitled to

26   reject a proffered measure of damages if it is too speculative.").

27         Moreover, Plaintiffs' request for an award of $16,302,699.79 rests on an additional

28   assumption that some *nonpaying* YouTube viewers would have been *paying* Crunchyroll

1    subscribers but for Defendant Pledge's infringement.  Plaintiffs also assume that the proportion of

2    Anime Episodes watched by paying Crunchyroll subscribers (approximately 34% of all of

3    Crunchyroll's viewers) *is equal* to the proportion of Anime Episodes that were watched on

4    YouTube as a result of Pledge's infringement, but would have been watched by paying

5    Crunchyroll subscribers had Defendant Pledge not infringed.  There is no evidence that any

6    nonpaying YouTube viewer would have paid to watch the Anime Episodes on Crunchyroll's

7    website, much less any evidence to support Plaintiffs' 34% figure.

8         Accordingly, because Plaintiffs have twice failed to present evidence supporting their

9    method of calculating damages, no damages should be assessed against Defendant Pledge.

10   **IV.    CONCLUSION**

11        For the foregoing reasons, it is recommended that Plaintiffs' Motion for Default Judgment

12   be GRANTED in part and DENIED in part.  Plaintiffs should be awarded no monetary damages,

13   and the following permanent injunction should be issued against Defendants Pledge, Barrera and

14   Admiral (and not Defendant Ahmad):

15        Defendants are permanently enjoined from Directly or indirectly
16        infringing Plaintiffs' rights in the Anime Serials or any anime
         product, whether now in existence or hereafter created, that is
17        owned, exclusively distributed, or otherwise controlled by the
         Plaintiffs, including without limitation by using the Internet or
18        any website or service to reproduce, copy, distribute, download,
         upload, or make available for distribution, sale, display, or
19        viewing any of the Plaintiffs' anime products, and to destroy all
         copies thereof that Defendants have obtained in violation of
20        Plaintiffs' copyrights.

21

22   This case shall be reassigned to a United States District Court judge.  Objections to this Report

23   and Recommendation shall be filed within fourteen (14) days.

24

25   Dated: February 10, 2014

26                                            _____
                                             JOSEPH C. SPERO
27                                            United States Magistrate Judge

28

26